# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

LARRY GRANT COBB, *et al.*

CRIMINAL CASE NO.

1:16-cr-00281-TCB-RGV

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

On October 11, 2016, a federal grand jury in the Northern District of Georgia returned a superseding indictment charging defendants Larry Grant Cobb ("Cobb"), Aaron Isaiah Walton ("Walton"), Seymour Wright ("Wright"), Jerrald Devonta Cook ("Cook"), and Dequantis Bennett, collectively referred to as "defendants," with various offenses following a series of armed robberies of hotels and an auto-parts business in the Atlanta area. [Doc. 19].[1] Defendants Walton, Wright, and Cook have moved to dismiss certain counts in the superseding indictment, [Docs. 51 & 65],[2] which the government opposes in a consolidated response, [Doc. 75]. Cook and Cobb have filed motions to suppress their statements made on September 15, 2016,

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] Cook filed a motion to adopt, [Doc. 69], Wright's motion to dismiss counts, [Doc. 65], and Cook's motion to adopt, [Doc. 69], is hereby **GRANTED**.

[Docs. 66 & 67], and Cobb has filed a supplemental motion to suppress, [Doc. 72], all of which the government opposes, [Docs. 93, 95, & 108].  Evidentiary hearings on Cook and Cobb's motions to suppress their statements were held on January 24, 2017, and January 31, 2017, respectively, [Docs. 77, 83, 86 & 87],[3] and the parties filed post-hearing briefs, see [Docs. 93, 95, 103, 104, & 108].[4]  For the reasons that follow,

---

[3] See [Doc. 86] for a transcript of the January 24, 2017, evidentiary hearing on Cook's motion to suppress statements and [Doc. 87] for a transcript of the January 31, 2017, evidentiary hearing on Cobb's motions to suppress statements.  Citations to the January 24, 2017, evidentiary hearing transcript will hereinafter be referred to as "(Tr. at ___)" and citations to the January 31, 2017, evidentiary hearing transcript will be referred to as "(Tr. 2 at ___)."  In addition, the government submitted exhibits at both hearings, which will be referred to as "(Gov. Ex. ___)" and "(Gov. 2 Ex. ___),"  and Cook submitted an exhibit at the January 24, 2017, evidentiary hearing, which will be referred to as ("Def. Ex. ___")."

[4] On May 9, 2017, Cook filed a sur-reply to the government's post-hearing reply brief, see [Doc. 109]; however, "[n]either the Federal Rules nor the Court's Local Rules allow sur-reply briefs as a matter of right, and the Court normally does not permit sur-replies."  USMoney Source, Inc . v. Am. Int'l Specialty Lines Ins. Co., No. 1:07-cv-0682-WSD, 2008 WL 160709, at *2 n.5 (N.D. Ga. Jan. 15, 2008), rev'd on other grounds, 288 F. App'x 558 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted); see also Leatherwood v. Anna's Linens Co., 384 F. App'x 853, 857 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted); United States v. Dooley, Criminal File No. 1:11–CR–255–3–TWT, 2013 WL 2548969, at *4 n.6 (N.D. Ga. June 10, 2013), adopted at *3.  "Although the Court may in its discretion permit the filing of a surreply, this discretion should be exercised in favor of allowing a surreply only where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief."  Fedrick v. Mercedes-Benz USA, LLC, 366 F. Supp. 2d 1190, 1997 (N.D. Ga. 2005 ) (citations omitted); see also St. James Entm't LLC v. Dash Crofts, Civil Action No. 1:09-CV-1975-RWS, 2010 WL 2802616, at *1 (N.D. Ga. July 13, 2010)  ("Certainly, the Court is disinclined to consider arguments raised in a surreply which could have been raised in an earlier filing.").  Cook did not seek leave prior to filing his sur-reply, and he has not identified any valid reason

it is **RECOMMENDED** that Walton, Wright, and Cook's motions to dismiss counts, [Docs. 51 & 65], and Cook and Cobb's motions to suppress their statements, [Docs. 66, 67 & 72], be **DENIED**.

## I.  STATEMENT OF FACTS

At the end of April 2016, Investigator Michael Buckley ("Inv. Buckley"), an investigator for the City of Atlanta Police Department's ("APD") robbery unit and a task force officer assigned to the Federal Bureau of Investigation's ("FBI") task force in the Atlanta area, and FBI Special Agent Robert McAllister ("Agent McAllister") began investigating a series of commercial robberies that began in late April 2016 and continued through August of 2016.  (Tr. 2 at 7-9; Tr. at 36).  On August 2, 2016, a grand jury in the Northern District of Georgia returned a one-count indictment charging Cobb with possession of a firearm after having previously been convicted of a felony offense, in violation of 18 U.S.C. § 922(g), [Doc. 1, dated 08/02/2016], and a warrant for his arrest was issued on the following day, [Doc. 3].  On September 14, 2016, Wright, Cook, and Walton were charged in a criminal complaint with conspiring to commit a series of Hobbs Act robberies, in violation of 18 U.S.C. § 1951(a), [Doc. 1, dated 09/14/2016], and arrest warrants were obtained for them that same day, (Tr. at 37; Tr. 2 at 9).  On the following day at 6:30

---

for filing the sur-reply.  Accordingly, the Court will not consider the sur-reply in ruling on Cook's pending motion to suppress statements.

a.m., Inv. Buckley and Agent McAllister met with other FBI agents and investigators from APD's Fugitive Apprehension Unit to execute the arrest warrants for Cobb, Wright, and Cook.  (Tr. 2 at 10; Tr. at 37).  At approximately 7:15 a.m., they traveled to the last known address for Cobb and Wright, but were unable to locate either defendant at that address.  (Tr. 2 at 10, 32).

Within ten minutes of arriving, agents received information that Cobb and Wright were at an apartment approximately one quarter mile away, and both Cobb and Wright were located and arrested at that apartment between 7:30 and 7:40 a.m. (Tr. 2 at 10-11, 33; Tr. at 37).  Cobb and Wright were placed in separate vehicles and transported to APD headquarters, which took approximately ten minutes.  (Tr. 2 at 11).  Shortly thereafter, some of the FBI agents that were assisting, including FBI Special Agent Matthew Winn ("Agent Winn")[5] of the violent crime squad and FBI Special Agent Tim Burke ("Agent Burke") traveled to the last known address for Cook, set up surveillance, and within ten minutes of arriving, observed Cook exit the apartment.  (Tr. at 9, 37; Tr. 2 at 12).  Agents Winn and Burke, who were in separate vehicles, pulled up and blocked Cook against the building, exited their

---

[5] Agent Winn explained that he was contacted by Detective Larry Williams ("Detective Williams") of the Gwinnett County Police Department in August 2016 to assist in the investigation of several hotel robberies.  (Tr. at 8, 17).

vehicles, drew their weapons, and instructed Cook to get on the ground.  (Tr. at 9).

He was placed in handcuffs.  (Tr. at 9; Tr. 2 at 12).

After being arrested, Cook requested that the agents notify his mother, who

was in the apartment, that he had been arrested, so Agent Winn knocked on the

door and spoke with Cook's mother.  (Tr. at 10).  Cook also asked if Agent Winn

could retrieve a number from his cell phone and give it to his mother.  (Id.).  Cook

was then transported to APD.  (Id.).  During the transport, Agent Winn provided

Cook with background information regarding where they were going, the charges,

and the process.  (Tr. at 10-11).  Agent Winn testified that Cook seemed nervous and

"asked [Agent Winn] a lot of questions about the case," and Agent Winn explained

that he was not the lead investigator and "downplayed [his] knowledge of the case,"

(Tr. at 11).

A.      **The September 15, 2016, Interview of Cook**

Agents Winn and Burke arrived at APD around 8:45 a.m. and placed Cook in

an interview room at approximately 8:53 a.m.  (Tr. at 11-12, 14; Gov. Ex. 1 at 8:53).

The video recording shows that Cook's hands were not in restraints when he was

placed in the interview room, but Agent Winn placed Cook in a single leg restraint.

(Gov. Ex. 1).  At this time, Cook asked to retrieve telephone numbers from his cell

phone, and Agent Winn went to get Cook's phone and assisted him in retrieving the

numbers and "told [Cook] he could use [Agent's Winn's] phone when [they were] done to make the calls if [Cook's phone] had died at that point." (Tr. at 15); see also (Gov. Ex. 1 at 8:53-8:57). Before his interview began, Cook also asked to use the bathroom, and Agent Winn took him to the restroom and then brought him back to the interview room. (Tr. at 15; Gov. Ex. 1 at 9:29-9:32). Agents Winn and Burke initiated the interview with Cook about forty minutes after he arrived in the interview room, while Inv. Buckley and Agent McAllister were interviewing Wright. (Tr. at 15-17, 30, 38-39; Tr. 2 at 17; Gov. Ex. 1 at 9:33).

While Agent Winn stepped out of the room to speak on the phone with Detective Williams, who was in the process of traveling to APD to participate in the interviews, Agent Burke collected biographical information from Cook for the U.S. Marshals booking sheet. (Tr. at 17; Gov. Ex. 1 at 9:34-9:44).[6] At 9:41 a.m., while Agent Burke was finishing the booking sheet, Agent Winn reentered the room, and at 9:44 a.m., Agent Winn asked Cook about his education and if he was able to read,

---

[6] While Agent Burke was completing the booking sheet, Cook asked if he could call his mother, and Agent Burke responded that before he was dropped off with the Marshals, they would let him call his mother. (Gov. Ex. 1 at 9:37). Cook also asked what would happen next, and Burke explained the process, including that he would have a chance to meet with a court-appointed lawyer that afternoon and that he would have a court appearance and may or may not get bond. (Gov. Ex. 1 at 9:38-9:39).

write, and speak English, and advised Cook of his <u>Miranda</u>[7] rights from an FBI Advice of Rights Form, FD-395,[8] by reading the contents of the form aloud to him. (Tr. at 18-19, 29; Gov. Ex. 1 at 9:44-9:46; Gov. Ex. 2).  Cook verbally stated he understood his rights and signed the waiver portion of the form at approximately 9:46 a.m., acknowledging that he had read his rights, understood them, and that he was willing to answer questions without a lawyer present, (Tr. at 19; Gov. Ex. 1 at 9:46; Gov. Ex. 2), and Agents Winn and Burke signed the form as witnesses, (Tr. at 19; Gov. Ex. 2).

---

[7] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

[8] The Advice of Rights form states:

Before we ask you any questions, you must understand your rights.
You have the right to remain silent.
Anything you say can be used against you in court.
You have the right to talk to a lawyer for advice before we ask you any questions.
You have the right to have a lawyer with you during questioning.
If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

(Gov. Ex. 2).  The form additionally provides a line for the interviewee to sign under the following statement: "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  (<u>Id.</u>).

At this time, Agent Burke left the interview room and Detective Williams took his place because he had more knowledge of the investigation.  (Tr. at 20; Gov. Ex. 1).  Agent Winn introduced Detective Williams, provided Cook an overview of the investigation, and advised him of the charges against him.  (Tr. at 20; Gov. Ex. 1).  Agent Winn said that federal sentencing was "harsh" and one of the ways people try to help themselves is by accepting responsibility and cooperating, and he explained that he could not make any guarantees, but typically, that is how people have improved their positions.  (Gov. Ex. 1 at 9:51).  Agent Winn continued to discuss with Cook the value of accepting responsibility, and Cook interrupted, stating, "I got a question.  You said, say if I don't wanna say anything you said a lawyer will come sit down with me and talk," and Agent Winn responded that he would be appointed a lawyer or he could hire one, but that "it won't happen right now [] so if you wanna talk to me and explain to me now it would be between you and me and Detective Williams [] if you decide not to do that then at a later date . . . you can hire a lawyer or one will be appointed for you in which you will be able to talk to that person." [Doc. 94-1 at 1-2]; <u>see also</u> (Gov. Ex. 1 at 9:55; Tr. at 30, 33).  Cook stated that he needed a phone call, so he could call his mother, and Agent Winn said that he would let him make a phone call, but he needed to "get through this part of it first" and this was Cook's "chance to talk to [Agent Winn] and explain

8

[his] side of the story." [Doc. 94-1 at 2]; (Gov. Ex. 1 at 9:55-9:56; Tr. at 30-33). Agent Winn continued to explain that this was Cook's chance to explain his motive for committing the robberies, and Cook stated, "I don't know what to think[.] I don't want to incriminate myself or nothing like that[.]" [Doc. 94-1 at 3]; (Gov. Ex. 1 at 9:57; Tr. at 31, 33). Agent Winn responded, "The bottom line is I think I've already shown you that you're incriminated." [Doc. 94-1 at 3]; (Gov. Ex. 1 at 9:57-9:58).

At 10:12 a.m., Cook said that he had another question, and he asked if they were trying to make a deal with him, and Agent Winn stated that he was not in any position to make a deal and that he had explained the benefits to Cook of accepting responsibility and cooperating. (Gov. Ex. 1 at 10:12-10:13; Tr. at 21-22, 34).[9] Agent Winn said that his cooperation would be reported to the prosecutor and to the court, but that he could not tell him exactly how much time he was facing or how much of a reduction he would get if he cooperated. (Gov. Ex. 1 at 10:14-10:15). Agent Winn and Detective Williams asked Cook to be straight with them, and Cook responded by asking if they would be straight with him and help him get less time. (Gov. Ex. 1 at 10:34). Agent Winn stated that he would do everything he could to

---

[9] Agent Winn testified that Cook was "very concerned with how long he'd be going to prison for, and he was trying to . . . negotiate some sort of deal for himself to get a better sentence." (Tr. at 22); see also (Tr. at 34). Agent Winn explained that he "made it very clear to [Cook] that [he was] in no position to make a deal with him." (Tr. at 22).

help him out if he was straight up with him.  (Gov. Ex. 1 at 10:34-10:35).  Cook then

proceeded to discuss the robberies.  (Gov. Ex. 1).

At 10:44 a.m., Cook asked if the prosecutors were going to come to see him,

and Agent Winn answered yes, Cook would see them.  (Gov. Ex. 1 at 10:44; Tr. at

23).  Agent Winn continued to question Cook, and at 11:01 a.m., Cook asked "when

will I be able to talk to a lawyer though?"  [Doc. 94-2 at 2]; (Gov. Ex. 1 at 11:01; Tr.

at 24, 34-35 ).  Agent Winn answered, "Today."  [Doc. 94-2 at 2]; (Gov. Ex. 1 at 11:02;

Tr. at 24, 34-35).  At that point, Agent Winn moved from the direct questioning part

of the interview and asked Cook why he was involved in the robberies.  (Gov. Ex.

1 at 11:02).

Agent Winn testified that Cook appeared to understand the questioning

during the course of the interview, and he did not ask the agents to stop the

interview or say he did not want to speak any longer.  (Tr. at 25).  Agent Winn

further testified that he did not interpret Cook's questions regarding the lawyer and

prosecutor as invoking his right to counsel.  (Tr. at 25, 32).  The portion of the

interview with Agent Winn and Detective Williams lasted approximately one hour

and forty-five minutes.  (Tr. at 24; Gov. Ex. 1).

Inv. Buckley interrupted the interview and told Agent Winn that he and

Agent McAllister had finished interviewing Wright.  (Tr. at 26; Gov. Ex. 1 at 11:18).

As Agent Winn and Detective Williams were exiting the interview room, Cook again asked if he could make a phone call, and Agent Winn stated that he would let him make a phone call, but they needed to finish talking first. (Gov. Ex. 1 at 11:18).[10]  At 11:24 a.m., Inv. Buckley and Agent McAllister entered the room and resumed the interview of Cook. (Tr. at 26; Gov. Ex. 1 at 11:24).  They introduced themselves, and Inv. Buckley emphasized the strong case they had against Cook, and like Agent Winn, he explained that this was Cook's opportunity to cooperate with them. (Gov. Ex. 1 at 11:25-11:26).  After answering Inv. Buckley's question about what car he was driving at one of the robberies, Cook said he had a question and asked, "The stuff you are telling me about now, is it true?" [Doc. 94-3 at 1]; (Gov. Ex. 1 at 11:28).  Both Inv. Buckley and Agent McAllister responded that it was true. (Gov. Ex. 1 at 11:28). Agent McAllister then gave Cook more background regarding the evidence they had against him and stated that the interview was his opportunity to cooperate, but it was up to Cook whether he would cooperate. (Gov. Ex. 1 at 11:28-11:29); [Doc. 94-3 at 1-2].  In particular, Agent McAllister stated, "It can go either one [of] three ways you can either cooperate and tell the truth or you could lie, which is fine, it's up to

---

[10] Agent Winn gave Agent McAllister and Inv. Buckley a brief summary of Cook's admissions thus far. (Tr. at 26-27).  Agent Winn testified that he did not recall mentioning anything to Agent McAllister and Inv. Buckley regarding Cook's remarks about a lawyer, (Tr. at 27), and Inv. Buckley testified that he did not know about Cook's prior comments about a lawyer, (Tr. at 48).

you or you could tell us some truth and some lies," but he said he would "rather for you just to lie altogether then to tell me some truth and tell me some lie ya know what I mean?" [Doc. 94-3 at 2]; (Gov. Ex. 1 at 11:29). Cook responded, "Yeah," and Agent McAllister continued, stating, "Tell the whole truth either be a man and tell the whole truth or just go ahead and lie or don't talk to us at all that's up to you ya know cause you been advised of your rights, right?" [Doc. 94-3 at 2]; (Gov. Ex. 1 at 11:29). Cook then stated, "Yeah but its like tell me whatever you feel like, I need a lawyer then ya know what I'm saying,"[11] and Agent McAllister responded, "Okay well then you know what that's, that's on you if you don't wanna talk to us you don't have to." [Doc. 94-3 at 2]; (Gov. Ex. 1 at 11:29). Cook stated, "Yeah I'll talk[.]" [Doc. 94-3 at 2]; (Gov. Ex. 1 at 11:29). Agent McAllister stopped Cook and told him to just listen to what they were telling him and decide how he wanted to respond.

---

[11] The government states that its "impression [is] that [] Cook said, 'I be feelin' like I need a lawyer . . .,'" [Doc. 95 at 10 n.2], and Agent McAllister testified that Cook's statement was "hard to understand," but it "almost sound[ed] like he sa[id] do you know if I feel like I need a lawyer," (Tr. at 41). At the evidentiary hearing, the Court asked the parties to stipulate to a transcript of relevant clips of the interview, if possible, otherwise both parties could submit their own transcript. (Tr. at 50-51). The FBI prepared transcriptions of relevant portions of Cook's interview, [Docs. 94, 94-1, 94-2, & 94-3], and Cook had no exception to them, [Doc. 94 at 2]. Thus, the Court will use the prepared transcripts in the discussion of Cook's pending motion to suppress. However, even if the Court considered the alternative interpretations offered by the government, the Court's analysis of whether Cook unequivocally invoked his right to counsel would remain the same.

(Gov. Ex. 1 at 11:29); [Doc. 94-3 at 2-3].  When Agent McAllister was explaining that Cook would be indicted by a grand jury, Cook asked if Agent McAllister was the prosecutor, and Agent McAllister said he was not and that he was the investigator, but that Cook would get to meet with the prosecutor.  (Gov. Ex. 1 at 11:30); [Doc. 94-3 at 3].  Agent McAllister then began discussing the robbery of Shakti Auto Parts, during which the owner was shot.  (Gov. Ex. 1).  Cook proceeded to make certain incriminating statements, including that he shot the owner in the leg during the robbery.  (Id.).[12]  The interview concluded at 12:18 p.m.  (Gov. Ex. 1 at 12:18).

Inv. Buckley testified at the evidentiary hearing that Cook was responsive to his questions, (Tr. at 40), and that he did not interpret Cook's comment about a lawyer as requesting counsel, (Tr. at 44, 47, 49).  Inv. Buckley also testified that Cook mumbled and was difficult to understand at times during the interview.  (Tr. at 50).  The portion of the interview with Agent McAllister and Inv. Buckley lasted approximately fifty-five minutes.  (Tr. at 43).  The entire interview lasted approximately two hours and forty-five minutes and was video recorded.  (Gov. Ex. 1).

After the interview had concluded, Agent Winn went back into the interview room to collect a DNA swab and fingerprints from Cook, (Tr. at 27; Gov. Ex. 1 at

---

[12]  At 11:58 a.m., Cook asked if he could make a phone call, and Agent McAllister and Inv. Buckley said yes, but not right now.  (Gov. Ex. 1 at 11:58).

12:28-12:30), and Agent Winn told Cook that he would contact his mother and fiancée and tell them about his hearing, (Gov. Ex. 1 at 12:32-12:33).  Agent Winn then transported him to the U.S. Marshals around 12:30 p.m.  (Tr. at 27; Gov. Ex. 1 at 12:33).

**B.**     **The September 15, 2016, Interview of Cobb**

Cobb arrived at APD around 8:00 a.m. and was placed in an interview room, (Tr. 2 at 11-12, 34), while agents interviewed Wright and Cook, who were placed in separate interview rooms, (Tr. 2 at 16; Tr. at 38).[13]  While in the interview room, Cobb remained in handcuffs and a leg restraint.[14]  (Tr. 2 at 35; Gov. 2 Ex. 1).  Agent Winn took Cobb to the bathroom around 10:45 a.m.  (Tr. at 2 at 35; Gov. 2 Ex. 1 at 10:46-10:56).  At about 12:20 p.m., Agent McAllister and Inv. Buckley began the interview of Cobb by first collecting biographical information for the U.S. Marshals

---

[13]  Inv. Buckley testified that he solicited the assistance of other law enforcement agents to assist in interviewing Cobb, Wright, and Cook.  (Tr. 2 at 17). He further testified that Agent Winn and Detective Williams had "limited knowledge" of the investigation and that there were no other officers or agents with that degree of knowledge that could assist with the other interviews.  (Id.).

[14]  Inv. Buckley explained that agents have discretion in determining what form of restraint should be used when an arrestee is in an interview room, depending on the person's known criminal history, the type of crime being investigated, and what the person was under arrest for at that time.  (Tr. at 2 at 38). Since Cobb was not able to be monitored while the other interviews were being conducted and given his previous criminal history, of which the agents were aware, Cobb was placed in handcuffs and a single leg restraint in the interview room.  (Tr. 2 at 19, 37-38).

booking sheet.  (Tr. 2 at 15, 17, 21; Gov. 2 Ex. 1 at 12:20-12:38). Agent McAllister then asked Cobb about his education and if he was able to read and write, to which Cobb responded that he had a tenth grade education and was able to read and write.  (Tr. at 2 at 21; Gov. 2 Ex. 1 at 12:39).  Agent McAllister proceeded to advise Cobb of his <u>Miranda</u> rights from an FBI Advice of Rights Form, FD-395,[15] by reading the contents of the form aloud to him.  (Tr. 2 at 21-22; Gov. 2 Ex. 1 at 12:39-12:40).  Cobb stated that he understood his rights and signed the waiver portion of the form at approximately 12:40 p.m., acknowledging that he had read his rights, understood them, and that he was willing to answer questions without a lawyer present, (Tr. 2 at 22-23; Gov. 2 Ex. 1 at 12:40; Gov. 2 Ex. 2), and Agent McAllister and Inv. Buckley signed the form as witnesses, (Tr. 2 at 22; Gov. 2 Ex. 1 at 12:41; Gov. 2 Ex. 2).  Cobb proceeded to make certain incriminating statements.  (Tr. 2 at 26; Gov. 2 Ex. 1).

At approximately 1:16 p.m., Agent McAllister presented a Waiver of the Right to Prompt Presentment to a Magistrate form[16] to Cobb and discussed it with him,

---

[15] The form was identical to the one presented to Cook, as previously described.  <u>See</u> (Gov. 2 Ex. 2).

[16] The form states:

> You have been arrested on federal charges.  You have the right to be taken without unnecessary delay to a magistrate judge, who will advise you of the charges against you and provide you with a copy of the document that identifies the charges against you, such as an indictment, complaint, or arrest warrant, and any affidavit the

and Cobb signed the waiver portion of the form at 1:20 p.m., acknowledging that he

voluntarily waived his right to appear before a United States Magistrate Judge on

that day and agreed to continue the interview, and Agent McAllister and Inv.

Buckley signed as witnesses.  (Tr. 2 at 25, 27-28; Gov. 2 Ex. 1 at 1:16-1:20; Gov. 2 Ex.

_____

government has filed in support of the complaint.

      The judge will also advise you of other rights you have, including:

        1.     You have the right to talk to an attorney and have the attorney represent you.
        2.     If you can't afford to pay an attorney, the court will appoint one to represent you.
        3.     You have the right to remain silent, and any statement that you make may be used against you in the courts on criminal charges.
        4.     You may have the right to a preliminary hearing, which is a court hearing where the government must prove that the charges against you are supported by probable cause.

      The judge also will tell you about the factors that will determine whether you can be released from custody on bond before your trial, or whether you must remain in jail.

(Gov. 2 Ex. 3). The form additionally provides a line for the defendant to sign under the following statement: "I UNDERSTAND THE RIGHTS DESCRIBED ABOVE, and by signing this document, I voluntarily waive the right to appear before a United States Magistrate Judge today, and agree to an interview, or to continue an interview, by law enforcement officer."  (Id.).

3).  Inv. Buckley testified that the interview then concluded at approximately 1:53

p.m.  (Tr. 2 at 28-29; Gov. 2 Ex. 1).[17]

Inv. Buckley testified that Cobb was calm and relaxed during the four-hour

period prior to the interview, aside from the short period of time he attempted to get

the attention of an agent because he needed to use the bathroom.  (Tr. 2 at 30-31).

Inv. Buckley further testified that Cobb "appear[ed] to understand" the questioning

during the interview, that he answered the questions in a coherent manner, and that

he "had a good recollection of the time line" and was able to discuss specific

incidents.  (Tr. at 2 at 24, 30).  Cobb never asked to stop the interview.  (Tr. 2 at 30;

Gov. 2 Ex. 1).  The agents did not use any physical force or make any threats or

promises to him.  (Tr. 2 at 30; Gov. 2 Ex. 1).  The interview lasted approximately an

hour and a half and was video recorded.  (Tr. 2 at 15; Gov. 2 Ex. 1).  After the

interview concluded, Cobb remained seated in the interview room, other than for

about eight minutes when he was taken out of the room, until approximately 2:47

p.m., at which time he was transported to the Atlanta City Jail.  (Tr. 2 at 29; Gov. 2

Ex. 1 at 1:53-2:47).[18]

---

[17] Inv. Buckley exited the interview room at this time, and Agent McAllister stayed in the room, gathering his materials, and continued to speak with Cobb until he also exited the room at approximately 2:04 p.m.  (Gov. 2 Ex. 1 at 1:53-2:04).

[18] The video continued recording until 3:08 p.m., and Inv. Buckley testified that he did not have a chance to stop the recording until after transporting Cobb to

**C.**    **The October 11, 2016, Superseding Criminal Indictment**

On October 11, 2016, a grand jury in the Northern District of Georgia returned a superseding indictment charging one count of conspiracy to commit Hobbs Act robberies, in violation of 18 U.S.C. § 1951(a), eight counts of Hobbs Act robberies of hotels and an auto-parts store, in violation of 18 U.S.C. §§ 1951(a) and 2, and eight counts of knowingly using, carrying, and brandishing a firearm in furtherance of the Hobbs Act robberies, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. See [Doc. 19]. All of the defendants are charged with the Hobbs Act conspiracy in Count One, and various defendants are charged in each of the Hobbs Act robberies and corresponding § 924(c) counts of the superseding indictment. See [id.]. The superseding indictment also charges Cobb with two counts of possession of a firearm after a previous felony conviction, in violation of 18 U.S.C. § 922(g)(1). See [id.].

## II.   DISCUSSION

**A.**    **Motion to Dismiss Counts, [Docs. 51, 65, & 69]**

Walton moves to dismiss counts three, five, and seven of the superseding indictment, which charge him with knowingly using, carrying, and brandishing a firearm during and in relation to Hobbs Act robberies charged in the superseding

---

the city jail. (Tr. 2 at 36; Gov. 2 Ex. 1 at 2:48-3:08).

indictment, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  [Doc. 51].  He contends that

these counts must be dismissed because "the predicate Hobbs Act robbery offenses

as defined by [18 U.S.C.] § 1951(b) do not qualify as 'crime(s) of violence' as a matter

of law."  [Id. at 3].  Wright similarly moves to dismiss counts three, five, seven, nine,

eleven, thirteen, fifteen, and seventeen of the superseding indictment, charging him

with knowingly using, carrying, and brandishing a firearm during and in relation

to Hobbs Act robberies, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  [Doc. 65; Doc. 81].

He asserts that the "Hobbs Act robbery charges . . . underlying each § 924(c) count

categorically fail to qualify as a 'crime of violence' within the meaning of 18 U.S.C.

§ 924(c)(3)(A), and the residual clause of § 924(c)(3)(B) is unconstitutionally vague

under [Johnson v. United States, 135 S. Ct. 2551 (2015)]."[19]  [Doc. 65 at 1].  Cook

--------

[19] In Johnson, the Supreme Court held that "imposing an increased sentence under the residual clause of the Armed Career Criminal Act [('ACCA'), 18 U.S.C. § 924(e),] violates the Constitution's guarantee of due process."  125 S. Ct. at 2563. "Under [the ACCA], a defendant convicted of being a felon in possession of a firearm faces more severe punishment if he has three or more previous convictions for a 'violent felony,' a term defined to include any felony that 'involves conduct that presented a serious potential risk of physical injury to another.'"  Id. at 2555 (quoting 18 U.S.C. § 924(e)(2)(B)).  The Supreme Court concluded that in deciding whether the residual clause covers a crime, a court is required "to picture the kind of conduct that the crime involves in 'the ordinary case,' and to judge whether that abstraction presents a serious potential risk of physical injury."  Id. at 2557 (citation omitted).  This "task goes beyond deciding whether creation of risk is an element of the crime" and "asks whether the crime *involves conduct* that presents too much risk of physical injury."  Id.  Thus, the Supreme Court ruled that the residual clause is unconstitutionally vague because it "leaves grave uncertainty about how to estimate the risk posed by a crime" and "about how much risk it takes for a crime to qualify

moves to dismiss counts seven, nine, eleven, and thirteen of the superseding indictment, which likewise charge him with violating § 924(c)(1)(A)(ii), for the reasons asserted in Wright's motion.  [Doc. 69].  In a consolidated response, the government argues that Hobbs Act robbery clearly qualifies as a crime of violence under the use of force clause in § 924(c)(3)(A) and that § 924(c)(3)(B) is not unconstitutionally vague.  [Doc. 75 at 3, 6].

Section 924(c)(1)(A) provides, in relevant part:

[A]ny person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or a drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime–

(i) be sentenced to a term of imprisonment of not less than 5 years;

(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

(iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

---

as a violent felony."   Id. at 2557-58.   The Supreme Court found that "the indeterminancy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges," and thus held that "[i]ncreasing a defendant's sentence under the clause denies due process of law."  Id. at 2557.

18 U.S.C. § 924(c)(1)(A).   Under § 924(c)(3), the term "crime of violence" means an

offense that is a felony and:

> (A) has an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3).  "The first clause is referred to as the 'use of force' clause of §

924(c) and the second as its corresponding residual clause."  <u>Chatfield v. United</u>

<u>States</u>, Case No. 16-22591-Civ-COOKE/TORRES, 2017 WL 1066776, at *8 (S.D. Fla.

Mar. 2, 2017), adopted by 2017 WL 1066779, at *1 (S.D. Fla. Mar. 21, 2017).

### 1.    *Use of Force Clause*

Walton, Wright, and Cook argue that Hobbs Act robbery under § 1951(b) does

not qualify as a crime of violence under the use of force clause of § 924(c)(3).  [Doc.

51 at 4; Doc. 65 at 4; Doc. 69].  "When examining a statute to determine if it qualifies

as a 'crime of violence' under § 924(c) the court must answer categorically–that is,

by reference to the elements of the offense, and not the actual facts of [the

defendant's] conduct."  <u>United States v. Lenzy</u>, CRIMINAL INDICTMENT NO.:

2:14-CR-00025-RWS-JCF, 2016 WL 1019712, at *2 (N.D. Ga. Feb. 4, 2016), adopted by

2016 WL 1047012, at *1 (N.D. Ga. Mar. 10, 2016) (alteration in original) (citations and

internal marks omitted).[20] "Under the categorical approach, the court looks solely to the elements of the statute to determine if the statute generally fits the definition of § 924." Id. (citing Descamps v. United States, 133 S. Ct. 2276, 2283 (2013)). "However, if the statute is 'divisible' then the court can employ a modified-categorical approach, allowing it to consider other documents, such as the indictment, to determine if it meets the definition of 'crime of violence.'" Id. (citing Descamps, 133 S. Ct. at 2283). A statute is divisible if it "sets out one or more elements of the offense in the alternative[.]" Descamps, 133 S. Ct. at 2281.

Section 1951(a) of the Hobbs Act provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or

---

[20] Some courts have questioned whether "the retrospective 'categorical approach' applies when determining, on a pretrial motion to dismiss, whether an offense may qualify as a 'crime of violence' under § 924(c)(3)." United States v. Collins, CRIMINAL ACTION NO. 1:14-CR-302-TWT-AJB, 2016 WL 1639960, at *29 (N.D. Ga. Feb. 9, 2016), adopted by 2016 WL 1623910, at *1 (N.D. Ga. Apr. 25, 2016). The undersigned likewise is not fully persuaded that the categorical approach should be applied to a pretrial motion to dismiss since "there is no issue of retrospective analysis." Id. However, in view of the parties' arguments and because numerous courts in this circuit have employed the categorical approach, this Report and Recommendation will undertake that analysis as well, but notes that the motions to dismiss could be denied without resorting to the categorical approach because the superseding indictment charges conduct constituting a crime of violence and "a jury will have an opportunity to determine whether the necessary elements have been established beyond a reasonable doubt in this case." Id. (citations omitted).

purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a).  The Hobbs Act defines "robbery" as:

[T]he unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

18 U.S.C. § 1951(b)(1).  The "Hobbs Act can be violated in numerous ways, including (1) robbery, (2) extortion, or (3) committing or threatening physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of 18 U.S.C. § 1951(a)." United States v. Philpot, Criminal Action No. 1:15-cr-00028-WSD-LTW, at [Doc. 90 at 7] (N.D. Ga. Nov. 16, 2016), adopted by 2016 WL 7404440, at *4 (N.D. Ga. Dec. 22, 2016) (citing Collins, 2016 WL 1639960, at *30).  Thus, the "'Hobbs Act is clearly a divisible statute as the language of the statute sets forth one or more elements of the offense in the alternative,'" Lenzy, 2016 WL 1019712, at *2 (quoting United States v. Brownlow, CASE NO. 1:15-cr-0034-SLB-SGC, 2015 WL 6452620, at *3 (N.D. Ala. Oct. 26, 2015)), and "application of the modified approach is appropriate," Philpot, Criminal Action No. 1:15-cr-00028-WSD-LTW, at [Doc. 90 at 7] (citations omitted).  When applying the modified categorical approach, the Court can look to "a limited class of documents, such as indictments," to determine

23

which alternative formed the basis of the defendant's charge.  <u>Descamps</u>, 133 S. Ct. at 2281.

Here, each Hobbs Act robbery count in the superseding indictment charges that the defendants, "aided and abetted by each other, did obstruct, delay, and affect commerce, by robbery, as that term is defined in Title 18, United States Code Section 1951, of [various businesses] . . . engaged in and affecting interstate commerce, and in furtherance of the plan and purpose to commit the robbery," and that the defendants "did knowingly commit and threaten physical violence against the persons of employees of the business[es], all in violation of Title 18, United States Code, Section 1951(a) and Section 2."  [Doc. 19 at 2-9].  "Comparing the charges to § 1951(a), it is clear that the indictment alleges that [defendants] committed the Hobbs Act violation of 'commit[ting] or threaten[ing] physical violence to [a] person or property in furtherance of a plan or purpose' to commit Hobb[]s Act robbery." <u>Collins</u>, 2016 WL 1639960, at *30 (third and fourth alterations in original). "'[C]ommit[ting] or threat[ening] physical violence to any person or property' *per se* meets § 924(c)(3)(A)'s definition of 'crime of violence' as an offense that 'has an element the use . . . or threatened use of physical force against the person or property of another.'" <u>Id.</u> (first, third, and fourth alterations in original) (comparing 18 U.S.C. § 1951(a) with 18 U.S.C. § 924(c)(3)(A)); <u>see also</u> <u>Philpot</u>, Criminal Action

No. 1:15-cr-00028-WSD-LTW, at [Doc. 90 at 7] (citations omitted) ("Here, the aiding and abetting Hobbs Act robbery charge in the Indictment is a crime of violence under the force clause because it includes as an element of the offense the use or threatened use of physical force against the person or property of another."); Lenzy, 2016 WL 1019712, at *3 (recommending that defendant's motion to dismiss the indictment be denied as the count of the indictment charging defendant with a robbery under the Hobbs Act, which "must be committed 'by means of actual or threatened force, or violence, or fear of injury, immediate or future,'" was a "qualifying charge under § 924(c)(3)(A)").[21]

Walton, Wright, and Cook assert that the Court should apply the categorical approach in determining whether Hobbs Act robbery qualifies as a crime of violence. [Doc. 51 at 4; Doc. 65 at 4; Doc. 69]. "Even if [the Court] were to apply the categorical approach, [the Court] would still agree with the precedent holding that Hobbs Act robbery is a crime [o]f violence under this approach." United States v. Rodriguez, CRIMINAL NO. 16-288, 2017 WL 1398334, at *2 (E.D. Pa. Apr. 18, 2017)

---

[21] In addition, the fact that the superseding indictment charges defendants with "aiding and abetting does not transform [the Hobbs Act counts] into not being a crime of violence" because "[a]iding and abetting, under 18 U.S.C. § 2 allows a defendant to be found guilty as a principal when he or she aides or procures someone else to commit the offense." Philpot, Criminal Action No. 1:15-cr-00028-WSD-LTW, at [Doc. 90 at 8] (citing In re Watt, 829 F.3d 1287, 1290 (11th Cir. 2016); In re Colon, 826 F.3d 1301, 1305 (11th Cir. 2016)).

(footnote and citation omitted).  In fact, the "U.S. Circuit Courts of Appeal to address this question have unanimously held that Hobbs Act robbery, *based on its elements alone*, is a 'crime of violence' under 18 U.S.C. § 924(c)(3)(A)."  Id. at *2 n.2 (emphasis added) (citing United States v. Anglin, 846 F.3d 954, 964-65 (7th Cir. 2017); United States v. Hill, 832 F.3d 135, 140-44 (2d Cir. 2016); In re Fleur, 824 F.3d 1337, 1340 (11th Cir. 2016); United States v. Howard, 650 F. App'x 466, 468-69 (9th Cir. 2016) (unpublished)); see also United States v. Gooch, 850 F.3d 285, 292 (6th Cir. 2017) ("We join our sister circuits in ruling that Hobbs Act robbery constitutes a crime of violence."); Wallace v. United States, CV 116-048, 2016 WL 4147164, at *1 (S.D. Ga. Aug. 4, 2016) (citing Fleur, 825 F.3d at 1340) ("[T]he Eleventh Circuit has determined that a Hobbs Act robbery conviction under 18 U.S.C. § 1951(a) qualifies as a crime of violence under the use-of-force clause in 924(c)(3)(A)."); cf. United States v. Robinson, 844 F.3d 137, 141-44 (3d Cir. 2016) (footnote omitted) (concluding that "analyzing a § 924(c) predicate offense in a vacuum is unwarranted when the convictions of contemporaneous offenses, read together, necessarily support the determination that the predicate offense was committed with the 'use, attempted use, or threatened use of physical force against the person or property of another'").[22]  Thus, "Hobbs Act robbery is a crime of violence under [§] 924(c)'s [use

---

[22] In his reply in support of his motion to dismiss, Wright argues that several of the cases relied on by the government are orders denying a petitioner's second or

of force] [c]lause under both the categorical and modified categorical approaches."

United States v. Rivera, CASE NO: 8:15-cr-337-T-36TBM, 2016 WL 4382710, at *3

(M.D. Fla. Aug. 17, 2016) (citations omitted); see also Rodriguez, 2017 WL 1398334,

at *3.[23]

---

successive motion to vacate his sentence under 28 U.S.C. § 2255, which he contends are "not binding precedent" because "[c]ircuit court orders on applications for second or successive habeas petitions are decided based only upon a simple form, without any briefing on the law or review of the record, and the only question at issue is whether the petitioner's application demonstrates that his habeas claim rests upon a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, or upon newly discovered evidence." [Doc. 81 at 2-3 (citations omitted)]. Wright also argues that these cases involve habeas proceedings, not pretrial matters, and thus do not constitute binding precedent. [Id. at 3-4]. However, the Court finds these arguments unpersuasive, as have other courts which have cited these cases in rejecting the argument that Hobbs Act robbery is not a crime of violence under § 924(c). See Philpot, 2016 WL 7404440, at *2-3 & n.5 (denying defendant's motion to dismiss); Collins, 2016 WL 1639960, at *28-31 (same); Lenzy, 2016 WL 1019712, at *2-4 (same).

[23] Walton asserts that "under the categorical approach, a prior offense can only qualify as a 'crime of violence' if all of the criminal conduct covered by a statute–including the most innocent conduct' matches or is narrower than the 'crime of violence' definition." [Doc. 51 at 4-5 (citation omitted)]. He argues that for Hobbs Act robbery to qualify as a crime of violence it must have an element of physical force, which "means 'violent force'–that is 'strong physical force,'" and Hobbs Act robbery "does not meet this requirement because it can be accomplished by putting someone in fear of future injury to his person or property, which does not require the use, attempted use, or threatened use of 'violent force.'" To support his argument, Walton cites United States v. Torres-Miguel, 701 F.3d 165 (4th Cir. 2012), which he contends is "directly on point." [Id. at 5-8 (citation and emphasis omitted)]. Wright and Cook make similar arguments. See [Doc. 65 at 5; Doc. 69]. However, "the Court finds these contentions unpersuasive." Chatfield, 2017 WL 1066776, at *11. "As an initial matter, the holding in Torres-Miguel is not binding, given that Torres-Miguel did not address Hobbs Act robbery, but rather a prior

2.      *Residual Clause*

Walton, Wright, and Cook assert that § 924(c)'s residual clause is unconstitutionally vague under Johnson. [Doc. 51 at 9; Doc. 65 at 9; Doc. 69]. While the Eleventh Circuit has "recently recognized that it is an open question whether *Johnson* applies to the residual clause set out in 18 U.S.C. § 924(c)(3)(B)," In re Gordon, 827 F.3d 1289, 1293 (11th Cir. 2016), "the undersigned need not address [their] argument that, in light of *Johnson v. United States*, the residual clause of 924(c) is unconstitutionally vague," Lenzy, 2016 WL 1019712, at *4. "Even if the residual clause was found to be unconstitutionally vague, that does not mean that any charge

---

California criminal conviction for a criminal threat, and it did not address § 924(c)(3)(A), but rather U.S.S.G. § 2L1.2." United States v. Godard, No. 4:16-CR-30-FL-1, 2017 WL 280703, at *2 (E.D.N.C. Jan. 20, 2017) (citing Torres-Miguel, 701 F.3d at 169). And, Walton, Wright, and Cook have "failed to direct the Court to any case that has found that a substantive Hobbs Act robbery is not a predicate 'crime of violence' under § 924(c)" and "'there appears to be little basis for a conclusion that Hobbs Act robbery is not categorically a 'crime of violence' within the context of 18 U.S.C. § 924(c)(3)(A).'" Chatfield, 2017 WL 1066776, *11-12 (citations omitted); see also Gooch, 850 F.3d at 292 (citation omitted) ("reject[ing] the defendant's argument that one could commit Hobbs Act robbery by 'putting the victim in fear of injury' without violence or threat of violence"); Collins, 2016 WL 1639960, at *24, 28 (rejecting similar arguments). Moreover, "the Supreme Court rejected the reasoning applied in *Torres-Miguel* and the idea that force, if indirectly applied such as by the use of poison, is not physical force." United States v. Williams, 179 F. Supp. 3d 141, 151 (D. Me. 2016) (citations omitted) (citing United States v. Castleman, 134 S. Ct. 1405, 1414-15 (2014)); see also United States v. McDaniels, 147 F. Supp. 3d 427, 433 (E.D. Va. 2015) (citing Castleman, 134 S. Ct. at 1414-15) ("Defendant's argument fails because the Supreme Court rejected the rationale of *Torres-Miguel* in a recent decision."). Thus, Walton, Wright, and Cook's arguments are without merit.

brought under § 924(c) would be subject to dismissal." Id. "As with the *Johnson* case itself where the court only invalidated the residual clause of § 924(e), the remaining definition, in this case the force clause definition of 'crime of violence,' could still serve as a basis for the charge." Id. Thus, "[b]ecause the Hobbs Act robbery charge[s] clearly [are] crime[s] of violence within the meaning of the force clause, there is no need to examine the constitutionality of the residual clause[.]" Philpot, Criminal Action No. 1:15-cr-00028-WSD-LTW, at [Doc. 90 at 10] (citations omitted); see also Fleur, 824 F.3d at 1340 (noting the court "need not decide, nor remand to the district court, the § 924(c)(3)(B) residual clause issue" because defendant's "companion conviction for Hobbs Act robbery, which was charged in the same indictment as the § 924(c) count, clearly qualifies as a 'crime of violence' under the use-of-force clause in § 924(c)(3)(A)"); Rivera, 2016 WL 4382710, at *3 ("This Court need not decide this issue, because, as discussed *infra*, Defendant's convictions for Hobbs Act robbery, which were charged in the same indictment as the § 924(c) count, qualify as a crime of violence under the use-of-force clause in § 924(c)(3)(A)."). As such, defendants Walton, Wright, and Cook have not asserted any valid reasons why these counts should be dismissed. Accordingly, it is **RECOMMENDED** that Walton, Wright, and Cook's motions to dismiss, [Docs. 51, 65, & 69], be **DENIED**.

**B.**   **Cobb's Motions to Suppress Statements, [Docs. 67 & 72]**

Cobb moves to suppress the statements he made following his arrest on September 15, 2016.  [Docs. 67 & 72].  Specifically, Cobb argues that his initial waiver and his statements were "clearly involuntary," given the coercive nature of his arrest and that he was "questioned for at least six and half hours" with "nothing to eat during [this] time."  [Doc. 72 at 1; Doc. 103 at 1].  The government contends that Cobb's post-arrest statements to law enforcement were made voluntarily and after a valid Miranda waiver and that the length of the interview "should not undermine the voluntariness of [his] statement[s] because [he] reaffirmed his desire to continue talking and specifically waived his right to prompt presentment in writing after being advised of his Rule 5 rights."  [Doc. 93 at 9].  The Court will address each argument.

**1.**   *Miranda Violation Claim*

Statements made in response to custodial interrogation are admissible only if the defendant was informed of his Miranda rights and waived them.  The government bears the burden of proving by a preponderance of evidence that Cobb validly waived his Miranda rights.  United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997) (citation omitted); see also Colorado v. Connelly, 479 U.S. 157, 168-69 (1986) (citations omitted).  In Miranda, the Supreme Court acknowledged that

30

custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  384 U.S. at 467.  Therefore, to address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, Miranda established certain procedures officers must follow. Specifically, prior to the initiation of custodial questioning, officers must fully advise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires."  Id. at 468-70.  Miranda further requires that law enforcement respect the suspect's decision to exercise his rights as outlined in the warnings.  "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."  Id. at 473-74 (footnote omitted).  "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."  Id. at 474.

A defendant may waive his rights under Miranda if the waiver is made knowingly, intelligently, and voluntarily.  Id. at 444.  This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being

> abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *3 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995)); see also Moran v. Burbine, 475 U.S. 412, 421 (1986) (citations omitted); Edwards v. Arizona, 451 U.S. 477, 482 (1981) (citations omitted); Fare v. Michael C., 442 U.S. 707, 725 (1979); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). "No single factor is necessarily determinative of the issue whether a defendant knowingly and intelligently waived his rights but the court must engage in a fact-specific inquiry based on all of the circumstances." Patterson, 2007 WL 2331080, at *3 (citation omitted). However, an express oral or written waiver of Miranda is strong proof of the validity of the waiver. United States v. Stephens, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002) (citation omitted). To find a waiver involuntary, "coercive police activity is a necessary predicate." Connelly, 479 U.S. at 167.

Inv. Buckley testified, and the video recording confirms, that Cobb knowingly, voluntarily, and intelligently waived his rights and agreed to speak with Agent McAllister and Inv. Buckley during the interview. Agent McAllister read Cobb his

Miranda warnings from an FBI Advice of Rights Form, FD-395. (Tr. 2 at 22; Gov. 2 Ex. 1 at 12:39-12:40; Gov. 2 Ex. 2). Cobb verbally indicated that he understood his rights and signed the form, and Agent McAllister and Inv. Buckley witnessed his signature at 12:40 p.m. (Tr. 2 at 21-23; Gov. 2 Ex. 1 at 12:40-12:41; Gov. 2 Ex. 2). After Cobb waived his rights, Inv. Buckley and Agent McAllister proceeded to question him, and Cobb then made certain incriminating statements that he now moves to suppress. (Tr. 2 at 26; Gov. 2 Ex. 1).

To find a waiver involuntary, "coercive police activity is a necessary predicate." Connelly, 479 U.S. at 167. However, there is no evidence in the record of any unlawful coercion of Cobb during his arrest, transport, or interview. The interview was conducted in an interview room at APD headquarters, where Cobb was seated at a table across from Inv. Buckley and Agent McAllister. (Tr. 2 at 11; Gov. 2 Ex. 1). The agents conducted the entire interview in a conversational tone and did not raise their voices. See (Gov. 2 Ex. 1). While Cobb remained in handcuffs and a leg restraint prior to and during the interview, there is no evidence of any physical force or threats being employed against him, and the restraints allowed him to change positions and walk around the interview room. (Tr. 2 at 30-31; Gov. 2 Ex. 1). Inv. Buckley testified that neither he nor Agent McAllister had their weapons while interviewing Cobb. (Tr. 2 at 35-36). The agents did not make any threats or

promises to induce Cobb to speak against his will, nor did they use any physical force.  (Tr. 2 at 30; Gov. 2 Ex. 1).  Accordingly, the totality of the circumstances demonstrate that Cobb voluntarily waived his rights.  See United States v. Telcy, 362 F. App'x 83, 86-87 (11th Cir. 2010) (per curiam) (unpublished) (finding voluntary consent where defendant was in handcuffs and in custody because officers did not employ any coercive tactics); United States v. Burston, Criminal Action No. 1:12-CR-180-01-JOF/AJB, 2013 WL 787909, at *11 (N.D. Ga. Jan. 4, 2013), adopted by 2013 WL 787911, at *1 (N.D. Ga. Mar. 1, 2013) (finding the defendant's waiver voluntary where there was no evidence of coercion, deception, or intimidation).

Cobb also knowingly and intelligently waived his rights.  Whether a suspect intelligently waived his rights depends on the particular circumstances in a case, including the background, experience, and conduct of the defendant; the defendant's age; familiarity with the criminal justice system; and his demeanor and conduct during the interrogation.  See Edwards, 451 U.S. at 482 (citations omitted); Coleman v. Singletary, 30 F.3d 1420, 1426-27 (11th Cir. 1994).  Cobb is an adult, who acknowledged that he could read and write the English language, and although he mentioned that he would need special education when asked by Agent McAllister if he wanted to finish school, (Gov. 2 Ex. 1 at 12:45), Cobb appeared to understand what the agents discussed with him, was attentive during the interview, and

34

answered their questions in a coherent manner, (Tr. 2 at 21-22, 24, 29-32; Gov. 2 Ex. 1).  Inv. Buckley testified that Cobb had a good recollection of the incidents and was able to discuss specific facts with the agents.  (Tr. 2 at 24).  Cobb did not ask to stop the interview at any time or refuse to answer questions, nor did he otherwise indicate that he did not understand his rights or the consequences of his waiver.  (Tr. 2 at 30; Gov. 2 Ex. 1).  On these facts, the government has shown that, under the totality of the circumstances, Cobb was clearly advised of his rights, and he knowingly, intelligently, and voluntarily waived them.  Patterson, 2007 WL 2331080, at *3-4; see also United States v. Watts, Case No. CR415-188, 2016 WL 6652470, at *3 (S.D. Ga. Oct. 13, 2016), adopted by 2016 WL 6652449, at *1 (S.D. Ga. Nov. 9, 2016) (second and third alterations in original) (quoting Devier v. Zant, 3 F.3d 1445, 1460 n.46 (11th Cir. 1993) (per curiam)) ("[S]uspect's waiver was knowing and intelligent despite low mental functioning where 'nothing in the record . . . suggest[ed] that he was so impaired as to not understand the meaning of the Miranda warnings'").

## 2.   *Voluntariness*

Although Cobb's statements were not taken in violation of Miranda, "the [C]ourt still must determine that any confessions or incriminatory statements made by [Cobb] were voluntary in order to admit them at trial."  United States v. Lazarus, 552 F. App'x 892, 895 (11th Cir. 2014) (per curiam) (unpublished) (citing United

States v. Bernal–Benitez, 594 F.3d 1303, 1317–18 (11th Cir. 2010)).   Whether a statement was voluntarily given must be examined in light of the totality of the circumstances.   United States v. Shepherd, Criminal Case No. 1:11–cr–00058–ODE–RGV–1, 2011 WL 4443440, at *7 (N.D. Ga. Aug. 23, 2011), adopted by 2011 WL 4443435, at *1 (N.D. Ga. Sept. 21, 2011) (citing Schneckloth, 412 U.S. at 226; Hubbard v. Haley, 317 F.3d 1245, 1252 (11th Cir. 2003)).   "This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of 'an essentially free and unconstrained choice.'"   United States v. Villaverde-Leyva, Criminal Action File No. 1:10-CR-035-RWS/AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010), adopted by 2011 WL 121932, at *1 (N.D. Ga. Jan. 14, 2011) (citation omitted).   "Among factors to consider are the [d]efendant's education and intelligence, length of detention, length of questioning, the use of coercive interrogation techniques and whether [d]efendant was advised of his constitutional rights."   United States v. Manta-Carillo, Criminal No. 11-00103-CB, 2011 WL 3235757, at *4 (S.D. Ala. July 28, 2011), aff'd, 491 F. App'x 125 (11th Cir. 2012) (per curiam) (unpublished) (citing United States v. Rouco, 765 F.2d 983, 993 (11th Cir. 1985)); see also Villaverde-Leyva, 2010 WL 5579825, at *11 (citations omitted).

The focus of the voluntariness inquiry is whether Cobb was coerced by the government into making the statement, and "[t]hose cases where courts have found confessions to be involuntary 'have contained a substantial element of coercive police conduct.'" Patterson, 2007 WL 2331080, at *4 (quoting Connelly, 479 U.S. at 164). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (citation and internal marks omitted); see also Martin v. Wainwright, 770 F.2d 918, 926 (11th Cir. 1985), modified in unrelated part by, 781 F.2d 185 (11th Cir. 1986) (per curiam) (alteration in original) (citation and internal marks omitted) (noting that the test for determining voluntariness of a confession and whether coercion was present is whether the defendant's "will [was] overborne and his capacity for self-determination critically impaired").

Under the totality of the circumstances in this case, the Court finds that Cobb's statements were not obtained as a result of coercion and were voluntarily made. There is no evidence that the agents threatened Cobb or used physical force against him apart from the physical force required to effect his arrest. (Tr. 2 at 30; Gov. 2 Ex. 1). While he was restrained in the interview room, the restraints allowed him to

change position and move freely around the room.  (Tr. at 2 at 30-31; Gov. 2 Ex. 1).

There is also no evidence that the agents made any promises to obtain Cobb's

statements.  (Tr. 2 at 30; Gov. 2. Ex. 1).  Although Agent McAllister discussed with

Cobb the benefits of cooperation, this exchange did not render Cobb's statements

involuntary.  See United States v. Davidson, 768 F.2d 1266, 1271 (11th Cir. 1985)

(citations omitted) ("A statement made by a law enforcement agent to an accused

that the accused's cooperation would be passed on to judicial authorities and would

probably be helpful to him is not a sufficient inducement so as to render a

subsequent incriminating statement involuntary."); see also United States v. de los

Santos, No. 1:05-cr-372-WSD, 2007 WL 2331070, at *8 n.12 (N.D. Ga. Aug. 13, 2007),

adopted at *2 (citations omitted) (noting the fact that the agents advised the

defendant that her cooperation may be helpful did "not establish coercion

undermining the voluntariness of [her] statements").  And, while Cobb did not have

food or water while in the interview room, Inv. Buckley testified that Cobb did not

ask for food or water, but had he asked, the agents "would have gladly brought him

. . . anything he wanted."  (Tr. 2 at 35, 37; Gov. 2 Ex. 1); see also Garcia-Dorantes v.

Warren, 769 F. Supp. 2d 1092, 1110 (E.D. Mich. 2011) (finding defendant had not

shown the police engaged in any coercive activity, despite his assertion that he had

not received food or water, as the evidence showed he had not asked for either while

in custody); <u>United States v. Finfrock</u>, No. 2:08-CR-54, 2010 WL 727223, at *7 (W.D. Mich. Feb. 25, 2010) ("In the absence of a specific request by the defendant, there was no reason for the FBI Agents . . . to provide her with food or drink.").  Indeed, when Cobb requested to use the bathroom, he was taken to the bathroom by one of the agents.  (Tr. 2 at 31; Gov. 2 Ex. 1 at 10:46-10:56).

Cobb asserts that he was questioned for six and a half hours and that the length of his interrogation renders his statements involuntary.  [Doc. 67 at 1; Doc. 72 at 1].  While Cobb's arrest, transport to APD, and interview took approximately six and a half hours, and he waited an additional approximately 55 minutes before being transported to the jail, (Tr. 2 at 11, 29, 32, 36-37; Gov. 2 Ex. 1), his actual interview lasted only approximately an hour and a half, (Tr. 2 at 15, 17, 19; Gov. 2 Ex. 1).  Inv. Buckley testified that Cobb was placed in the interview room a few minutes prior to the video starting at 8:11 a.m., and aside from a short bathroom break, Cobb sat in the room until his interview began at 12:20 p.m. while the agents interviewed Wright and Cook.  (Tr. 2 at 16; Gov. 2 Ex. 1).  Under the circumstances, the length of Cobb's detention did not render his statements involuntary.  <u>See Lumpkins v. Sec'y of Dept' of Corr.</u>, 449 F. App'x 879, 885 (11th Cir. 2011) (per curiam) (unpublished) (finding 17 hour interrogation, which included a 5 or 6 hour break while detectives interviewed alibi witnesses, "did not render [defendant's]

confession involuntary"); <u>see also</u> <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 387 (2010) (citation omitted) (noting that where interrogations of greater duration were found to be improper, "they were accompanied, as this one was not, by other facts indicating coercion, such as an incapacitated and sedated suspect, sleep and food deprivation, and threats"); <u>Parker v. Turpin</u>, 60 F. Supp. 2d 1332, 1374 (N.D. Ga. 1999), <u>aff'd</u>, 244 F.3d 831 (11th Cir. 2001) (finding the "length of the interrogation in combination with the other facts previously mentioned d[id] not suggest that [defendant's] confession was coerced," as he "was not interrogated for 10 hours straight").  Thus, Cobb's statements were made voluntarily and in conformity with the dictates of <u>Miranda</u>.

### 3.   *Prompt Presentment*

Cobb argues that his statements should be suppressed because the agents failed to comply with the prompt presentment requirement of Rule 5 of the Federal Rules of Criminal Procedure.  [Doc. 103 at 2].  The government contends that although Cobb's interview extended beyond the six-hour safe harbor, he signed a presentment waiver and his earlier <u>Miranda</u> waiver cured any possible issue as to prompt presentment.  [Doc. 93 at 15].

Federal Rule of Criminal Procedure 5 states that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before

a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise." Fed. R. Crim. P. 5(a)(1)(A). Any statements obtained from a defendant before he has had an initial appearance before a magistrate judge are subject to suppression if there was an unnecessary delay in conveying the defendant to the magistrate judge. See Corley v. United States, 556 U.S. 303, 307-08 (2009) (discussing the presentment exclusionary rule established in McNabb v. United States, 318 U.S. 332 (1943), and Mallory v. United States, 354 U.S. 449 (1957)). Under 18 U.S.C. § 3501(c), any admissions made within six hours of arrest are deemed admissible as long as they were made voluntarily and are otherwise admissible under the Federal Rules of Evidence. Id. at 322. A confession that is obtained outside of the six hour window can still be admissible if the "longer delay was 'reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate][.]'" Id. (quoting 18 U.S.C. § 3501(c)). "If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases, and if it was, the confession is to be suppressed." Id.

When determining whether a violation of Rule 5 has occurred, courts consider the reasons for the delay, United States v. Purvis, 768 F.2d 1237, 1239 (11th Cir. 1985)

(per curiam), including factors such as "the availability of a committing magistrate, the length of the delay before the prisoner is taken before the magistrate, and the police purpose or justification, if any, for the delay," United States v. Mendoza, 473 F.2d 697, 702 (5th Cir. 1973) (citation and internal marks omitted)[24]; see also United States v. Harrold, 679 F. Supp. 2d 1336, 1352 (N.D. Ga. 2009), adopted at 1338 (citation omitted).  "Several courts have held that the burden of demonstrating an unreasonable delay in presentment rests with the [d]efendant."  United States v. Charleston, CRIMINAL CASE NO.: 1:15-cr-00127-TWT-JSA, 2016 WL 7422685, at *9 (N.D. Ga. Nov. 21, 2016), adopted by 2016 WL 7404651, at *1 (N.D. Ga. Dec. 21, 2016) (citations omitted).

Cobb was arrested at 7:30 a.m.[25] on September 15, 2016, and was transported to APD headquarters and placed in an interview review.  (Tr. 2 at 10-12, 34).  While the agents were interviewing Wright and Cook, Cobb sat in the interview room until approximately 12:20 p.m., when his interview began, lasting until 1:53 p.m.  (Tr. 2 at 15-17, 21, 29; Gov. 2. Ex. 1).  It is undisputed that approximately twenty-three

---

[24] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[25] Inv. Buckley testified that Cobb was arrested between 7:30 a.m. and 7:40 a.m., (Tr. 2 at 11), but for the purposes of this Report and Recommendation, the Court will use the earlier end of the range.

minutes of Cobb's interview extended beyond the six-hour mark.  [Doc. 93 at 9].

"However, 'like other important rights, the right to prompt presentment may be

waived.'" <u>Charleston</u>, 2016 WL 7422685, at *9 (quoting <u>United States v. McDowell</u>,

687 F.3d 904, 910 (7th Cir. 2012)).  At 1:16 p.m., prior to the six-hour mark, Agent

McAllister explained Cobb's right to presentment and discussed with him the

Waiver of the Right to Presentment to a Magistrate form, which Cobb signed and

Agent McAllister and Inv. Buckley witnessed at 1:20 p.m.  (Tr. 2 at 27; Gov. 2 Ex. 1

at 1:16-1:20; Gov. 2 Ex. 3).  "While [Cobb] challenges the voluntariness of all of []his

waivers and statements, the Court finds against him on that issue for all of the

reasons discussed above."  <u>Charleston</u>, 2016 WL 7422685, at *9.  Thus, "suppression

on grounds of a prompt presentment violation should be denied at the outset, as

waived."  <u>Id.</u>[26]  And, "[w]here, as here, [Cobb] waive[d] his Rule 5(a) right, there is

no reason for judicial inquiry into whether the delay in presentment was

unreasonable or unnecessary under § 3501(c) and *McNabb-Mallory*."  <u>McDowell</u>, 687

---

[26] In addition to the presentment waiver, Cobb "waived any objection to delay in presentment via his <u>Miranda</u> waiver."  <u>United States v. Villanueva</u>, CASE NO. 8:12-CR-205-T-17MAP, 2016 WL 3344227, at *10 (M.D. Fla. June 13, 2016) (noting that "Corley did not directly overrule precedents holding that a waiver of <u>Miranda</u> rights is a wa[i]ver of the right to prompt presentment" and that therefore <u>O'Neal v. United States</u>, 411 F.2d 131 (5th Cir. 1969), which held "that although accused was arrested about noon and was not taken before the United States Commissioner until [the] next morning, extra-judicial admission made by accused in the interim after he had been advised of his constitutional rights were admissible[,] remains binding precedent").

F.3d at 910-11.  Accordingly, it is **RECOMMENDED** that Cobb's motion to suppress statements and supplemental motion to suppress, [Docs. 67 & 72], be **DENIED** in their entirety.

## C.    Cook's Motion to Suppress, [Doc. 66]

Cook moves to suppress statements he made following his arrest on September 15, 2016.  [Doc. 66].  In particular, Cook argues he "did not understand the Miranda warnings read to him due to a number of factors, like age, schooling, and physical health"; that his statements were "not knowingly, intelligently and voluntarily made"; and that he was "interrogated without counsel by at least four law enforcement officers over three hours despite making at least three requests for counsel."  [Id. at 1-2].  The government responds that Cook voluntarily, knowingly, and intelligently waived his Miranda rights and that his post-arrest statements were voluntary.  [Doc. 95 at 12-17].  In addition, the government asserts that Cook did not unambiguously request counsel during the course of the interview.  [Id. at 17].  The Court will address each of these arguments.

### 1.    *Miranda Violation Claim*

As previously discussed, statements made in response to custodial interrogation are admissible only if the defendant was informed of his Miranda rights and waived them, and it is the government's burden to prove by a

preponderance of evidence that Cook validly waived his <u>Miranda</u> rights.  <u>Chirinos</u>, 112 F.3d at 1102 (citation omitted); <u>see also</u> <u>Connelly</u>, 479 U.S. at 168-69 (citations omitted).  A defendant may waive his rights under <u>Miranda</u> if the waiver is made knowingly, intelligently, and voluntarily.  <u>Miranda</u>, 384 U.S. at 444.  This inquiry has two distinct dimensions, in that the "relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  <u>Patterson</u>, 2007 WL 2331080, at *3 (citation omitted).

The testimony of Agent Winn at the evidentiary hearing and the video recording satisfies the government's burden of establishing that Cook knowingly, intelligently, and voluntarily waived his rights and agreed to speak with the agents during the interview.  Agent Winn testified that he read Cook his <u>Miranda</u> warnings from an FBI Advice of Rights Form, FD-395.  (Tr. at 18-19, 29; Gov. Ex. 1 at 9:44-9:46; Gov. Ex. 2).  Cook verbally stated that he understood his rights and signed the form, and Agents Winn and Burke witnessed his signature at 9:48 a.m.  (Tr. at 19; Gov. Ex. 2).

As previously stated, "coercive police activity is a necessary predicate" to finding a waiver involuntary, Connelly, 479 U.S. at 167, but there is no evidence in the record of any unlawful coercion of Cook prior to or during the interview on September 15, 2016. The interview was conducted in a room at APD where he was seated with two law enforcement agents. See (Gov. Ex. 1). The agents conducted the entire interview in a conversational tone and did not raise their voices or yell at Cook. See (id.). Cook's leg remained shackled during the interview, though he was not in handcuffs, but there is no evidence of any physical force or threats being employed against him. (Id.). Although testimony was not elicited regarding whether the agents had firearms in their possession during Cook's interview, no firearms are visible on the agents in the video recording. (Id.). The agents did not make any promises to Cook to induced him to speak against his will. (Id.). Accordingly, the totality of the circumstances demonstrate that Cook voluntarily waived his rights. See Telcy, 362 F. App'x at 86-87; Burston, 2013 WL 787909, at *11; United States v. Manson, Criminal Indictment No. 1:11-CR-13-AT-LTW-2, 2012 WL 2861595, at *2 (N.D. Ga. July 11, 2012) (citation omitted).

In addition, the record clearly shows that Cook's waiver was made knowingly and intelligently. The evidence shows that Cook was an adult, who had an eleventh grade education and could read and write the English language. (Gov. Ex. 1 at 9:44-

9:46).  And, although Cook appears to assert that he did not understand the Miranda

warnings that were read to him because he was twenty years old, had an eleventh

grade education, and spent the entire previous night working, [Doc. 104 at 11]; see

also (Def. Ex. 1), "there is nothing in the record to suggest that he was so impaired

as to not understand the meaning of the *Miranda* warnings," Devier, 3 F.3d at 1460

n.46 (citation omitted); see also Dunkins v. Thigpen, 854 F.2d 394, 399 (11th Cir.

1988) (finding that a nineteen year old defendant, who was functionally illiterate,

understood his Miranda rights and knowingly waived his rights); Watts, 2016 WL

6652470, at *3 (finding the waiver of a defendant with a sixth-grade education and

poor literacy knowing and intelligent because "there [was] no evidence that [his]

cognitive abilities were so impaired that he was unable to understand his *Miranda*

rights").  Cook appeared to understand the questions during the interview and was

responsive to the questioning, (Tr. at 25, 40; Gov. Ex. 1), and his interactions with the

agents during the interview showed that he was alert, despite having worked the

night shift, (Gov. Ex. 1).  Indeed, he asked the agents questions throughout the

interview, including whether the agents were being straight with him and telling

him the truth.  (Gov. Ex. 1 at 10:34, 11:28; Tr. at 23, 40, 47); [Doc. 94-3 at 1].  He also

made the remark that he did not want to incriminate himself, [Doc. 94-1 at 3]; (Gov.

Ex. 1 at 9:57; Tr. at 31, 33), which, as the government points out, shows that he

understood the risks of cooperating and making statements, [Doc. 95 at 13]. Cook did not ask to stop the interview at any time or refuse to answer the agents' questions, and he did not indicate that he did not understand his rights or the consequences of his waiver. (Tr. at 24-25; Gov. Ex. 1). Thus, the totality of the circumstances surrounding the interview demonstrates that Cook was clearly advised of his rights, and he voluntarily, knowingly, and intelligently waived them. Patterson, 2007 WL 2331080, at *3-4.

### 2.   *Voluntariness*

"[E]ven where the Court determines that a defendant's statements were not taken in violation of Miranda, the [C]ourt still must determine that any confessions or incriminatory statements made by [Cook] were voluntary in order to admit them at trial." United States v. Bhatt, 160 F. Supp. 3d 1359, 1363 n.7 (N.D. Ga. 2016) (second alteration in original) (citation omitted) (citing Lazarus, 552 F. App'x at 895). As stated in the discussion of Cobb's motion to suppress, whether a statement was voluntary must be examined in light of the totality of the circumstances, Shepherd, 2011 WL 4443440, at *7 (citations omitted), and "factors to consider are the [d]efendant's education and intelligence, length of detention, length of questioning, the use of coercive interrogation techniques and whether [d]efendant was advised

of his constitutional rights," Manta-Carillo, 2011 WL 3235757, at *4 (citation omtited); see also Villaverde-Leyva, 2010 WL 5579825, at *11 (citations omitted).

As previously discussed, the focus of the voluntariness inquiry is whether the defendant was coerced by the government into making the statement. "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." Jones, 32 F.3d at 1517 (citation omitted). Another "'factor to consider among the totality of the circumstances in determining voluntariness'" is whether the police employ deceptive tactics to elicit a confession. United States v. Graham, Criminal Action File No. 3:13–cr–11–TCB, 2014 WL 2922388, at *9 (N.D. Ga. June 27, 2014), adopted at *1 (quoting Holland v. McGinnis, 963 F.2d 1044, 1051 (7th Cir. 1992) (citing Frazier v. Cupp, 394 U.S. 731, 739 (1969)). However, "'[c]ourts have been reluctant to deem trickery by the police a basis for excluding a confession on the ground that the tricks made the confession coerced and thus involuntary.'" Id. (alteration in original) (quoting Aleman v. Vill. of Hanover Park, 662 F.3d 897, 906 (7th Cir. 2011)). Rather, courts have held that "trickery or deceit is only prohibited to the extent it deprives the suspect of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." Soffar v. Cockrell, 300 F.3d 588, 596 (5th Cir.

2002) (internal marks omitted) (quoting <u>Moran</u>, 475 U.S. at 424).  Thus, "[t]he kinds of deception that are generally deemed to trigger suppression are lies about a defendant's legal rights (*i.e.*, 'you must answer our questions'), false promises (*i.e.*, 'whatever you say will be just between us'), or threats (*i.e.*, 'if you don't talk, you won't see your family for a very long time')."  <u>United States v. La Forgia</u>, Criminal No. 12-0057-WS-C, 2012 WL 1869035, at *4 (S.D. Ala. May 22, 2012) (footnote omitted) (citing <u>United States v. Degaule</u>, 797 F. Supp. 2d 1332, 1380 (N.D. Ga. 2011), adopted at 1344); <u>see also</u> <u>Aleman</u>, 662 F.3d at 906 (alteration in original) (citation and internal marks omitted) ("The confession must be excluded only if the government feeds the defendant false information that seriously distorts his choice, [for example] by promising him that if he confesses he will be set free—in other words, only if the false statement destroyed the information that he required for a rational choice."); <u>United States v. Lall</u>, 607 F.3d 1277, 1285-86 (11th Cir. 2010) (citations omitted) (noting that police misrepresentations of fact are not enough to render a confession involuntary, but misrepresentations of law are more likely to do so); <u>United States v. Rogers</u>, 906 F.2d 189, 191-92 (5th Cir. 1990) (confession not voluntary where police "assured [defendant] that he would not be arrested if he cooperated with them").

Additionally, the law in the Eleventh Circuit "is clear, that the police's use of a trick alone will not render a confession involuntary," unless there are "other aggravating circumstances" beyond the mere use of deceptive tactics, United States v. Castaneda-Castaneda, 729 F.2d 1360, 1363 (11th Cir. 1984) (citations omitted); see also Frazier, 394 U.S. at 739 (observing that misrepresentations by the police are "insufficient [by themselves] to make [an] otherwise voluntary confession inadmissible"); United States v. Middleton, 245 F. App'x 867, 872 (11th Cir. 2007) (per curiam) (unpublished) (citation omitted) (noting that the "single interrogation trick" of lying about the evidence against a defendant, "in the absence of any other aggravating circumstances suggesting coercion on the part of [the police,] does not automatically render [the statement] involuntary"). Indeed, "[c]onfessions are not generally rendered inadmissible merely because they are obtained by fraud, deception, or trickery practiced upon the accused, provided the means employed are not calculated to procure an untrue statement and the confession is otherwise freely and voluntarily made." Moore v. Hopper, 389 F. Supp. 931, 934 (M.D. Ga. 1974) (citations omitted); see also United States v. Blue, 122 F. App'x 427, 430 (10th Cir. 2005) (unpublished) (citations omitted) ("Without more, . . . misrepresentations, ruses, and trickery by questioning authorities do not render a voluntary confession involuntary.").

Under the totality of the circumstances in this case, the Court concludes that

Cook's statements to the agents on September 15, 2016, were not obtained as a result

of coercion and were made voluntarily.  Cook's interview took less than three hours,

which is a reasonable amount of time.  (Gov. Ex. 1); see also Martin, 770 F.2d at 923,

927 (finding no coercion in spite of 5 hours of interrogation).  There is no evidence

that the agents threatened Cook or made any promises to obtain his statements, or

otherwise used any physical force during the interview. (Gov. Ex. 1).[27]  While Agent

Winn placed Cook in a leg restraint that remained in place during the interview,

Cook's was not in handcuffs and was able to get up and move around the table.

(Id.).  While the agents discussed with Cook the benefits of cooperation and stated

they would let the prosecutor know if Cook cooperated, these statements do "not

_____

[27] To the extent Cook contends that the circumstances of his arrest rendered his waiver of rights or subsequent statements to law enforcement involuntary, [Doc. 104 at 1], he has failed to make an adequate showing as the "Eleventh Circuit has previously held far more violent arrests did not render a waiver of rights or subsequent statements involuntary," United States v. Chung, CIVIL ACTION FILE NUMBER 1:13-cr-379-TCB, 2016 WL 6440128, at *2 (N.D. Ga. Oct. 28, 2016) (citing United States v. Rouco, 765 F.2d 983, 993 (11th Cir. 1985)) (noting the Eleventh Circuit determined a "defendant's confession was voluntary even though it was given after the defendant was placed face-down on hot parking-lot pavement and handcuffed, an agent put his foot on the defendant's shoulders and pointed a gun at the defendant's head, and the defendant was placed in the back of an unairconditioned police car with the windows rolled up for twenty minutes in July in Miami").

establish coercion undermining the voluntariness of [his] statements." de los Santos,

2007 WL 2331070, at *8 n.12 (citations omitted).

Cook argues that his statements were involuntary and should be suppressed

because Agent Winn made a false promise of immunity. [Doc. 104 at 8, 12]. To

support his argument, Cook points to Agent Winn's statement that the interview

"would be between [Cook], [Agent Winn], and Detective Williams[.]" [Doc. 44-1 at

1-2]; (Gov. Ex. 1 at 9:55). While "false promises," such as "'whatever you say will

be just between us,'" are "generally deemed to trigger suppression," La Forgia, 2012

WL 1869035, at *4 (footnote omitted) (citing Degaule, 797 F. Supp. 2d at 1380), when

viewed in context, Agent Winn's statement is devoid of trickery or deceit, see (Gov.

Ex. 1). Approximately twenty minutes after Agent Winn initiated the interview,

Cook stated, "I got a question. You said, say if I don't wanna say anything you said

a lawyer will come sit down with me and talk?" [Doc. 94-1 at 1]; (Gov. Ex. 1 at 9:55).

In response, Agent Winn stated:

> You will be appointed a lawyer or you can hire a lawyer. It won't
> happen right now [] so if you wanna talk to me and explain to me now
> it would be between you and me and Detective Williams [] if you
> decide not to do that then at a later date a lawyer will either you can
> hire a lawyer or one will be appointed for you in which you will be
> able to talk to that person.

[Doc. 94-1 at 2]; see also (Gov. Ex. 1 at 9:55). Considering Agent Winn's statement

in the context of Cook's question about his right to an attorney, the government

correctly points out that "Agent Winn was [simply] informing Cook, consistent with *Miranda*, that he had a right to a lawyer, that he would get one later, and that if he chose to talk at that moment, that it would be just between Cook and the agents (because no lawyer was present)."  [Doc. 108 at 3].   Contrary to Cook's assertion, Agent Winn's statement was not a false promise to keep Cook's statements secret. Rather, it was merely a statement clarifying Cook's question that if he chose to talk to the agents at that time, a lawyer would not be present, and the interview would take place between Agent Winn, Detective Williams, and Cook.   In fact, shortly thereafter, Agent Winn told Cook that his acceptance of responsibility and cooperation would be communicated to the prosecutor and the court.  (Gov. Ex. 1 at 10:14-10:15).  Thus, Cook's statements were made voluntarily and in conformity with the dictates of Miranda.

### 3. *Invocation of Right to Counsel*

Although the evidence shows that Cook was informed of and waived his right to counsel by consenting to speak with law enforcement, Cook argues that he requested a lawyer three times during the September 15, 2016, interview, and that any statements made after he invoked his right to counsel should be suppressed. [Doc. 104 at 7-8].  The Court disagrees.

"If the suspect effectively waives his right to counsel after receiving the _Miranda_ warnings, law enforcement officers are free to question him," but "if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation."  Davis v. United States, 512 U.S. 452, 458 (1994) (citation omitted) (citing Edwards, 451 U.S. at 484-85).  Courts have to "determine whether the accused _actually invoked_ his right to counsel," which is an objective inquiry.  United States v. Gonzalez-Delgado, 4:16-cr-259-AKK-TMP, 2017 WL 874571, at *3 (N.D. Ala. Feb. 7, 2017), adopted by 2017 WL 840591, at *1 (N.D. Ala. Mar. 3, 2017) (citations and internal marks omitted) (quoting Davis, 512 US. 458-59); see also Ford v. Schofield, 488 F. Supp. 2d 1258, 1290 (N.D. Ga. 2007), aff'd sub nom., Ford v. Hall, 546 F.3d 1326 (11th Cir. 2008) (citation omitted).  "Invocation of the _Miranda_ right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney."  Gonzalez-Delgado, 2017 WL 874571, at *3 (citation and internal marks omitted) (quoting Davis, 512 US. 458-59).  That is, "[t]he suspect's request for counsel must be unambiguous and unequivocal."  United States v. Propst, 369 F. App'x 42, 46 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted) (citing Davis, 512 U.S. at 452).  If a suspect "makes a statement concerning the right to counsel that is ambiguous or equivocal

or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his . . . *Miranda* rights." United States v. Thomas, Criminal Action No. 4:13-CR-22-RLV, 2014 WL 793359, at *7 (N.D. Ga. Feb. 25, 2014), aff'd, 621 F. App'x 618 (11th Cir. 2015) (per curiam) (unpublished) (internal marks omitted) (quoting Berghuis, 560 U.S. at 381).

Cook asserts that he referenced the need for a lawyer three times during the interview. [Doc. 104 at 8]. First, Cook stated to Agent Winn, "I got a question. You said, say if I don't wanna say anything you said a lawyer will come sit down with me and talk," [Doc. 94-1 at 1-2]; (Gov. Ex. 1 at 9:55; Tr. at 30, 33), and later, Cook asked Agent Winn when he would be able to talk to a lawyer, [Doc. 94-2 at 2]; (Gov. 1 at 11:01; Tr. at 24, 34-35). Cook acknowledges that these "initial two requests were arguably equivocal." [Doc. 104 at 8]. Indeed, as the government points out, "neither of these questions could have been reasonably interpreted as an assertion of [Cook's] right to counsel." [Doc. 95 at 19]. The Court agrees that these first two references to lawyers were not unequivocal invocations of Cook's right to counsel, and thus, Agent Winn was not required to stop questioning Cook. See Degaule, 797 F. Supp. 2d at 1382 n.56 (quoting United States v. Doe, 170 F.3d 1162, 1166 (9th Cir. 1999)) (noting that the "defendant's question, 'What time will I see a lawyer?' was not [a]

clear statement invoking Miranda rights"); see also Davis, 512 U.S. at 461 ("Unless the suspect actually requests an attorney, questioning may continue.").

Cook made a third reference to a lawyer during the interview when Agent McAllister told Cook that he did not have to talk to them and that it was up to him because he had been advised of his rights, Cook responded, "Yeah but its like tell me whatever you feel like, I need a lawyer then ya know what I'm saying." [Doc. 94-3 at 2]; (Gov. Ex. 1 at 11:29). As the government correctly contends, [Doc. 95 at 19], "[t]his is the sort of equivocation or ambiguity that falls short of an affirmative invocation of the right to counsel under Davis," Gonzalez-Delgado, 2017 WL 874571, at *4; see also Davis, 512 U.S. at 459-62 (holding that "[m]aybe I should talk to a lawyer" was not an unambiguous invocation of the right to counsel); United States v. Peters, 435 F.3d 746, 751-52 (7th Cir. 2006) (observing that circuits have held that a statement such as "I might want to talk to an attorney" or "[d]o you think I need a lawyer?" or a request to call someone about possible representation is too ambiguous to constitute invocation of right to counsel); Dormire v. Wilkinson, 249 F.3d 801, 805 (8th Cir. 2001) (holding that "could I call my lawyer" was not unequivocal); United States v. Zamora, 222 F.3d 756, 766 (10th Cir. 2000) (statement "I might want to talk to an attorney" not "an unequivocal request for counsel"); Mincey v. Head, 206 F.3d 1106, 1132 (11th Cir. 2000) (citation omitted) (finding

defendant's statement "'go ahead and run the lawyers'" did not "constitute[] an 'unambiguous or unequivocal request for counsel'"); United States v. Ortiz, 499 F. Supp. 2d 224, 232 (E.D.N.Y. 2007) (finding statement that defendant "thinks he wants to speak to a lawyer" insufficient to invoke Fifth Amendment rights).

Moreover, after Cook made the above statement, Agent McAllister again stated that it was Cook's decision whether he wanted to speak with the agents, but that he did not have to do so, and Cook stated, "Yeah I'll talk," indicating his willingness to continue the interview without a lawyer.  (Gov. Ex. 1 at 11:29); [Doc. 94-3 at 2]; see also Gonzalez-Delgado, 2017 WL 874571, at *4 (finding the equivocation of defendant's statement was underscored by the fact that he thereafter indicated his willingness to deal with the police unassisted).[28] Thus, because Cook's statements were made voluntarily and in conformity with the dictates of Miranda and he did not make an unequivocal or unambiguous statement invoking his right to counsel, his statements are not due to be suppressed.   It is, therefore, **RECOMMENDED** that Cook's motion to suppress statements, [Doc. 66], be **DENIED**.

---

[28] Cook points out that he asked several times to call his mother.  [Doc. 104 at 11]; (Tr. at 33).  To the extent that he is arguing that these requests invoked his right to counsel, "[i]t is clear that [Cook's] stated desire to call his mother was not an invocation of his right to an attorney."   United States v. Moore, No. 2:05CR50FTM29SPC, 2006 WL 462592, at *2 (M.D. Fla. Feb. 27, 2006) (citations omitted).

### III.   CONCLUSION

For the forgoing reasons and cited authority, Cook's motion to adopt Wright's motion to dismiss, [Doc. 69], is **GRANTED**, and it is **RECOMMENDED** that Walton and Wright's motions to dismiss counts, [Docs. 51 & 65], and Cook and Cobb's motions to suppress their statements, [Docs. 66, 67 & 72], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 1st day of June, 2017.

*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

59